# EXHIBIT A-2

DATE FILED: January 27, 2023 3:36 PM
FILING ID: 69FCDFB17013D
CASE NUMBER: 2023CV30060

| | |
|---|---|
| DISTRICT COURT, LARIMER COUNTY, STATE OF COLORADO<br>201 La Porte Ave, Suite 100<br>Ft. Collins, CO 80521 | |
| **ADDISON QUINTANA**,<br><br>  Plaintiff,<br><br>v.<br><br>**NUTRIEN LTD.**, a Canadian limited liability company, **NUTRIEN FINANCIAL,** Nutrien's wholly owned finance company., and **AGRIUM U.S., INC.**, a subsidiary of Nutrien.<br><br>  Defendants. | ▲COURT USE ONLY▲ |
| *Attorneys for Plaintiff:*<br><br>Iris Halpern (Reg. No. 53112)<br>Laurie Jaeckel (Reg. No. 41447)<br>RATHOD | MOHAMEDBHAI, LLC<br>2701 Lawrence St., Suite 100<br>Denver, CO 80205<br>T: (303) 578-4400<br>ih@rmlawyers.com<br>lj@rmlawyers.com | Case No.:<br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Addison Quintana, by and through counsel Iris Halpern and Laurie Jaeckel of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury Demand as follows:

## **INTRODUCTION**

Plaintiff Addison Quintana is a technology expert who is also transgender, Native American, and Latinx. In February 2020, she started working as a technology consultant for Nutrien Financial. At that time, she presented as male at work. After successfully managing multiple complex projects for the company, she signed a contract in October 2021 with WorkThru, a third-party payroll provider, to continue providing her technology services for Nutrien Financial. During her consultancy, Ms. Quintana was praised and recognized for her work.

In 2021, however, after Ms. Quintana came out to her team as transgender and informed them that she intended to transition, her situation at the company rapidly deteriorated. Her supervisor, Julie Shuffler, told Ms. Quintana that "Ed" (Ms. Quintana's former name associated with male pronouns) was an outstanding project manager, but "Addie" (the name reflecting her true gender identity) was not performing. Ms. Shuffler then began micromanaging Ms. Quintana to an excruciating degree and treating her differently than her white, cisgender colleagues. After Ms. Quintana complained to leadership about race and gender discrimination in late January 2022, she faced retaliation in the form of termination of the consultancy. On February 10, 2022, less than three weeks after Ms. Quintana submitted her discrimination complaint, Nutrien Financial terminated her, resulting in Ms. Quintana's contract with WorkThru to end.

This case is about justice for a transgender, Native American, and Latinx woman who was treated unfairly in the workplace. In her Complaint, Ms. Quintana brings claims for tortious inference with contract, discrimination and retaliation under 42 U.S.C. § 1981, and discrimination under 42 U.S.C. § 1985(3).

## PARTIES, JURISDICTION, AND VENUE

1. At all times relevant to this Complaint, Plaintiff Addison Quintana was a legal resident of and domiciled in the State of Colorado.

2. Defendant Nutrien Ltd. ("Nutrien") is a Canadian limited liability company with its corporate headquarters in Saskatoon, Saskatchewan.

3. Nutrien is the one of the largest producers and distributors of potash and nitrogen fertilizer in the world.

4. At all times relevant to this complaint, Nutrien had two corporate campuses located in Loveland, Colorado.

5. Nutrien conducted business in the State of Colorado as Nutrien Ag Solutions, which was duly registered in Colorado.

6. Defendant Nutrien Financial ("Nutrien Financial") is Nutrien's wholly owned finance company.

7. At all times relevant to this Complaint, Defendant Nutrien Financial was duly registered in Colorado and conducted business in the State of Colorado.

8. Nutrien Financial provides financing solutions to Nutrien's customers to purchase agricultural products.

9. Nutrien Financial conducts business out of at least one of Nutrien's two corporate campuses in Loveland, Colorado.

10. Defendant Agrium U.S., Inc. ("Agrium U.S.") is a subsidiary of Nutrien.

11. At all times relevant to this Complaint, Defendant Agrium U.S. was duly registered in Colorado and conducted business in the State of Colorado.

12. Agrium U.S. operates a network of retail farm centers in the United States and Latin America.

13. Venue is proper pursuant to C.R.C.P. 98(c), as one or more Defendants reside in Larimer County.

14. The Court has personal jurisdiction over the parties pursuant to C.R.S. § 13-1-124(1), as the acts and omissions giving rise to Plaintiff's claims occurred in the State of Colorado.

## FACTUAL ALLEGATIONS

### *Ms. Quintana's Extensive Background in Technology*

15. Ms. Quintana is an experienced technology consultant.

16. Ms. Quintana has been working in the field of technology for over 20 years.

17. For the past 13 years, Ms. Quintana has been working successfully as an independent technology consultant.

18. Ms. Quintana's clients have included multi-billion-dollar companies across numerous industries, including aerospace and defense, global real estate, global financial services, healthcare, entertainment, and agriculture.

### *Ms. Quintana's Consultancy with Nutrien Financial and 2021 Contract with WorkThru*

19. In February 2020, Ms. Quintana interviewed with Nutrien Financial for a technology consultant position.

20. At that time, Ms. Quintana presented as male at work.

21. Ms. Quintana was awarded the job by Nutrien Financial within a few days after her interviews.

22. Nutrien Financial agreed to pay Ms. Quintana at a rate of $125 per hour for her services.

23. At the beginning of the consultancy, Ms. Quintana's contract was administered through Fidelis, a technology services provider out of New York City.

24. On October 1, 2021, Ms. Quintana signed a contract with WorkThru to continue providing consulting services to Nutrien Financial.

25. WorkThru is a third-party payroll provider headquartered in Houston, Texas, which works with companies to manage their independent contractor workforce, including onboarding, contract management, and payroll.

26. Ms. Quintana's contract with WorkThru to service Nutrien Financial ran from October 1, 2021, to March 31, 2022.

27. Under the contract, Nutrien Financial paid WorkThru, and WorkThru paid Ms. Quintana a rate of $125 per hour to provide services to "the Client . . . . on behalf of [WorkThru]."

28. Although the contract names Agrium U.S. as "the Client," it was understood by the parties that Ms. Quintana would be providing her services to Nutrien Financial.

29. Under the contract, "the specific details" of the services to be provided by Performance Engineering Solutions, Ms. Quintana's consulting company, were to be agreed upon by Ms. Quintana and Nutrien Financial.

30. Ms. Quintana was responsible for "determin[ing] the method, details, and means for performing the Services," and she was required to perform her obligations in compliance with "any and all applicable laws and regulations."

31. In return, she was paid for her services by WorkThru after submitting timesheets.

32. WorkThru was allowed to terminate its contract with Ms. Quintana "without notice or payments in lieu of notice, if the Client [Agrium U.S.] terminates its contract for Services with the Company [WorkThru] for any reason or reduces requirements for Services."

### *Ms. Quintana's Work as a Consultant for Nutrien Financial*

33. Ms. Quintana performed all her services as a consultant for Nutrien Financial in Colorado. After the pandemic began in March 2020, she worked from her home in Parker, Colorado.

34. Ms. Quintana successfully managed Nutrien Financials' most critical and complex technology projects.

35. She worked as Senior Project Manager leading the company's larger initiatives, including the Foundation Canadian 1.5 initiative, which was a large digital transformation effort

involving moving Nutrien Financial from outdated systems to new cloud-based platforms across all operations in Canada.

36. The Foundation Canadian 1.5 initiative received distinguished recognition by executive leadership for the quality of the project's execution.

37. Ms. Quintana also successfully worked on the initial phase of the U.S. Digital Transformation project, which involved implementing digital technologies for Nutrien Financials' U.S. markets.

38. Ms. Quintana worked under the IT organization, which was initially led by Vice President Debasis Bhaumik, Senior Director Rory Monteith, Manager Stephen Weins, and Program Manager Julie Shuffler.

39. From February 2020 to October 2021, when Ms. Quintana's contract was through Fidelis, her contract was up for renewal every three to six months.

40. Ms. Shuffler oversaw the renewal process, and she extended Ms. Quintana's contract each renewal period.

41. In October 2020, when Ms. Quintana was looking to refinance her house and presented as Ed, Ms. Shuffler wrote Ms. Quintana's loan officer confirming that "[Ed] works as a Project Manager for a long-term SAP implementation that is expected to run for the next 1.5 to 2 years." She added that Nutrien Financial "intend[s] to extend Ed's consulting contract throughout the life of the project and possibly beyond."

42. Throughout her consultancy with Nutrien Financial, Ms. Quintana received praise and recognition for her work.

43. For example, in November 2020, Nutrien Financial Solution Architect Vinod Khelani emailed Ms. Quintana expressing his gratitude for her work and expertise. He praised Ms. Quintana for her "idea of the risk-based strategy" and noted that he could "go on and on to state many examples of how you shaped the entire delivery which laid the foundation for success." He ended his email by noting the "entire team feels the same" way about how it was a privilege and an honor to work with Ms. Quintana.

44. In January 2021, as the Foundation Canadian 1.5 initiative was wrapping up, Ms. Quintana had a phone call with Mr. Weins. During that call, Mr. Weins commented that Ms. Quintana had a "really strong reputation" at Nutrien Financial and was "well-regarded" at the company.

45. In March 2021, after the Foundation Canadian 1.5 initiative finished, Mr. Weins informed Ms. Quintana during a phone call that he wanted to extend her contract for services

because of the great work she was doing. Mr. Weins told Ms. Quintana he would give her projects to fill in the gap before the U.S. Digital Transformation project began.

46. The U.S. Digital Transformation project would take years to complete, and Mr. Weins told Ms. Quintana in the phone call that she should consider her contract extended indefinitely.

**Ms. Quintana Comes Out as Transgender and Faces Discrimination**

47. In September 2020, Ms. Shuffler asked Ms. Quintana why she wasn't sharing her video screen during a work meeting.

48. Ms. Quintana turned on her screen and informed Ms. Shuffler that she is transgender and considering transitioning full-time at work.

49. Ms. Quintana officially came out as transgender to her team in February 2021.

50. In July 2021, in one of their weekly one-on-one meetings, Ms. Shuffler told Ms. Quintana that "Ed" (Ms. Quintana's former name) was an outstanding project manager, but "Addie" was not performing.

51. Ms. Shuffler also told Ms. Quintana during this conversation she did not think "Addie" had the wherewithal to successfully lead the U.S. implementation. Ms. Shuffler asked Ms. Quintana: "Aren't you the same person? Hasn't Ed done this before?"

52. During this same conversation, Ms. Shuffler told Ms. Quintana that she was a "complete failure" as a project manager and had "completely dropped the ball" on the Foundation Canadian 1.5 initiative. Ms. Shuffler said this even though the project ended in February 2021 and Ms. Quintana received distinguished recognition for her work on that project.

53. Ms. Shuffler gave Ms. Quintana two weeks to resolve her alleged performance issues or Ms. Shuffler was going to release her from her contract. Ms. Shuffler provided Ms. Quintana with no details or documents related to her alleged performance deficiencies.

54. After her conversation with Ms. Shuffler, Ms. Quintana messaged Mr. Weins.

55. Mr. Weins informed Ms. Quintana that he was also blindsided by Ms. Shuffler's comments and would get to the bottom of the issue.

56. Mr. Weins later called Ms. Quintana and told her Ms. Shuffler's comments were a mistake and Ms. Quintana wasn't going anywhere. He specifically told Ms. Quintana that "we need you."

57. After their meeting in July 2021, Ms. Shuffler continued to treat Ms. Quintana differently than her white, cisgender colleagues.

58. Before July 2021, Ms. Shuffler rarely came to Ms. Quintana's meetings and Ms. Quintana enjoyed substantial freedom and autonomy in her work.

59. After July 2021, Ms. Shuffler began to micromanage Ms. Quintana to an excruciating degree, constantly questioning her decisions and trying to find faults in insignificant aspects of her work. She would talk over Ms. Quintana during meetings and treated her like a junior project manager who needed direction on all her tasks.

60. The treatment by Ms. Shuffler became so abusive that other employees noticed it, including Project Coordinator Myra Masters, who witnessed Ms. Shuffler humiliating Ms. Quintana in public meetings and nitpicking her work. Ms. Masters told Ms. Quintana that she suspected Ms. Shuffler was treating Ms. Quintana differently because she was "brown and trans."

61. Nutrien Financial business leadership was entirely composed of white individuals.

62. In meetings, Ms. Quintana was often one of a few persons of color in the meetings, and the Nutrien Financial leadership in the meetings was entirely white.

63. Ms. Quintana was the only project manager of color in Nutrien Financial.

64. Ms. Quintana was frequently pushed to the point of tears by Ms. Shuffler's abusive and discriminatory treatment.

### *Ms. Quintana Complains About Race and Gender Discrimination and Faces Retaliation*

65. In the fall of 2021, Mr. Weins moved to a different department of Nutrien and was replaced by Ashu Sharma.

66. After getting word a new manager was starting, Ms. Quintana emailed Ms. Shuffler asking if Mr. Sharma was their new manager.

67. Ms. Shuffler responded in an email that Ms. Quintana found racially derogatory and hostile:

> **From:** Julie Shuffler <Julie.Shuffler@nutrien.com>
> **Sent:** Thursday, September 23, 2021 11:43 AM
> **To:** Addie Quintana <Addie.Quintana@nutrien.com>
> **Subject:** RE: Meeting Forward Notification: NF R2 Steering Committee
>
> Yep. Looked him up on LinkedIn. A dude. An Indian dude. Of course. Probably relatively young guy with zero management experience. Again. Yay.

68. After receiving this email, it more clearly dawned on Ms. Quintana that her treatment by Ms. Shuffler was a byproduct of her ethnicity and gender.

69. On October 27, 2021, Ms. Quintana called Mr. Sharma to express her concerns about how she was being discriminated against because of her ethnicity and gender. She told Mr. Sharma that she was being treated differently than her white, cisgender colleagues because she was Native American, Latinx, and transgender.

70. Mr. Sharma set up a 30-minute meeting with him and Ms. Shuffler the next day. Because Ms. Quintana believed it was pertinent to their conversation, she forwarded Mr. Sharma the September 23rd email from Ms. Shuffler about the new manager being "[a]n Indian dude" with "zero management experience."

71. On October 28, 2021, Mr. Sharma wrote in response to Ms. Quintana's email: "I want the conversation related to the project only, the deliverables and expectations from a Project Manager."

72. Because it appeared Mr. Sharma was going to ignore her primary reasons for setting up a meeting, Ms. Quintana responded to the email reiterating some of the concerns about discrimination she expressed in their call.

73. She told Mr. Sharma that Ms. Shuffler treated her differently than her white, cisgender colleagues, including Leslie Warner-Garcia, who was a newer and more junior project manager than Ms. Quintana. Ms. Quintana reported that in contrast to Ms. Shuffler's treatment of Ms. Quintana, who was criticized constantly and "micromanaged [by Ms. Shuffler] to the nth degree," Ms. Warner-Garcia was allowed "far more operating control" and freedom.

74. Ms. Quintana also relayed to Mr. Sharma the conversation she had with Ms. Shuffler when she said that as "Ed," Ms. Quintana was "an excellent project manager" but "that she is not seeing Addie perform."

75. Rather than having an open and honest conversation regarding Ms. Quintana's concerns about race and gender discrimination, Mr. Sharma used the meeting on October 28, 2021, to have Ms. Shuffler read Ms. Quintana her job description and confirm she understood what Ms. Shuffler had read. This was the first time Ms. Quintana had seen the job description during her time at Nutrien Financial.

76. When Ms. Quintana tried to speak up during the meeting about how she was being treated differently than Ms. Warner-Garcia, she was silenced by Mr. Sharma, who told her not to bring Ms. Warner-Garcia into the conversation.

77. Ms. Quintana specifically told Mr. Sharma and Ms. Shuffler she did not feel that she was being treated "equally or equitably" compared to her other team members.

78. She expressed concern about her contract ending, but she was told by Mr. Sharma that was not happening.

79. After her meeting with Mr. Sharma and Ms. Shuffler, Ms. Quintana's situation at Nutrien Financial continued to deteriorate.

80. Ms. Quintana was kept from attending key meetings, and she was criticized and humiliated by Ms. Shuffler in the meetings she did attend.

81. Unlike other project managers, Ms. Quintana was forced to endure constant public scrutiny, and she was forced on a weekly basis to go before the team to show her work and defend her decisions.

82. Ms. Shuffler also tried to set Ms. Quintana up for failure; for instance, by asking Ms. Quintana to create a complete project plan when Ms. Quintana did not have the information necessary to do so. When Ms. Quintana pointed out this impossibility, she was attacked by Ms. Shuffler in return.

83. Ms. Quintana continued to voice concerns about how she was being treated to other team members from November 2021 to January 2022.

84. In January 2022, the working conditions at Nutrien Financial became so oppressive that Ms. Quintana escalated her complaints to Human Resources.

85. On January 24, 2022, she emailed Leslie Coleman, Nutrien Vice President of Diversity and Inclusion, and Michael Webb, Nutrien Executive Vice President of Human Resources, regarding her situation.

86. Ms. Quintana specifically told Ms. Coleman and Mr. Webb in her email:

By virtue of empirical evidence, emails, direct communication via team meetings, indirect communication in team meetings and on direct MS Teams Calls, and through my own personal observations/experiences and those of others on my team; **I believe that I am being actively discriminated against for my status as an indigenous/latinx transwoman in Nutrien Financial (NF)** by my immediate NF Information Technology supervisor Julie Shuffler - Program Manager and as of January 7th to date, by the NF Digital Enablement Leadership team led by Director Ryan Folkers, Senior Manager Cara Anzola, and Manager Ryan Davis.

87. Ms. Quintana asked Ms. Coleman and Mr. Webb to have "open and honest discussions about [her situation] because the conditions under which [she was] working continue to degrade and [management's] behaviors continue to escalate on a weekly basis."

88. Ms. Quintana also attached a narrative timeline to her email documenting her concerns.

89. Ms. Coleman forwarded Ms. Quintana's complaint to Jeff Srulovitz, Vice President, Chief Integrity Officer, and General Counsel of Nutrien.

90. Mr. Srulovitz informed Ms. Quintana the same day that a member of his team would be reaching out to her to discuss her concerns and to talk about next steps in the process.

91. Ms. Quintana responded to Mr. Srulovitz and asked if he had time to walk her through next steps in the process. She also told Mr. Srulovitz about how she "continue[d] to be paraded on front of the team to have [her] work on the NF R2 project plan publicly scrutinized in meetings, specifically for that purpose, on a weekly basis– when [she] have never had to do this since [she] started in Feb of 2020." She asked Mr. Srulovitz for this practice to stop.

92. When Ms. Quintana and Mr. Srulovitz spoke on the phone on October 24th and 25th, she reiterated to him that she believed she was being discriminated against by management at Nutrien Financial because of her race and gender.

93. Ms. Quintana also walked Mr. Srulovitz though the narrative timeline she provided.

94. At the end of the conversation, Ms. Quintana asked Mr. Srulovitz: "Jeff, what does this look like to you?"

95. Mr. Srulovitz responded: "It looks like retaliation."

96. On January 25, 2022, Angela Giroux, Assistant General Counsel and North America Integrity Officer for Nutrien, called Ms. Quintana to discuss her concerns.

97. As she did with Mr. Srulovitz, Ms. Quintana specifically explained to Ms. Giroux that she believed Nutrien Financial was discriminating against her because of her status as a Native American, Latinx, and transgender woman.

98. Ms. Giroux said they would investigate and be in touch.

99. On February 8, 2022, Ms. Giroux sent Ms. Quintana an email informing her the company had completed its investigation and "concluded that there was no Code of Conduct violation related to Nutrien employees' communications and activities involving you."

100. Ms. Giroux further stated that "[t]he investigation revealed that Nutrien's employees' conduct related to legitimate concerns with not receiving satisfactory services pursuant to your contract," and Ms. Giroux anticipated "IT leadership will have further conversations with you in that regard, and discussions about a path forward."

101. Instead of having discussions with Ms. Quintana about a path forward, Nutrien Financial ended the relationship two days later.

*Termination of Ms. Quintana's Contract with WorkThru*

102. On February 10, 2022, WorkThru representatives called Ms. Quintana to inform her Nutrien Financial was terminating her consultancy and therefore WorkThru must terminate its contract with Ms. Quintana.

103. Nutrien Financial did not provide WorkThru with a reason for the termination.

104. The same day, WorkThru sent Ms. Quintana a letter informing her that "Nutrien has terminated its contract with WorkThru for services by [Ms. Quintana]."

105. In turn, WorkThru is "terminating its contract with [Ms. Quintana] pursuant to section 5.3 (b) [of the contract], effective today." Section 5.3(b) provides that WorkThru may terminate its contract with Ms. Quintana "without notice or payments in lieu of notice, if the Client [Agrium U.S.] terminates its contract for Services with the Company [WorkThru] for any reason or reduces requirements for Services."

**FIRST CLAIM FOR RELIEF**
**(Tortious Interference with Contract)**

106. Ms. Quintana hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

107. A contract existed between Ms. Quintana and third-party WorkThru.

108. Defendants knew or reasonably should have known of the contract between Ms. Quintana and third-party WorkThru.

109. Defendants intentionally and improperly interfered with the performance of the contract between Ms. Quintana and third-party WorkThru by terminating Ms. Quintana's consultancy for discriminatory and retaliatory reasons.

110. As a direct result of Defendants' actions, Ms. Quintana has suffered significant injuries, damages, and losses in an amount to be determined at trial.

111. Defendants' conduct was attended by circumstances of fraud, malice, or willful and wanton conduct, such that Ms. Quintana notifies Defendants now that she intends to move for exemplary damages pursuant to C.R.S. § 13-21-102.

**SECOND CLAIM FOR RELIEF**
**(Discrimination in Violation of 42 U.S.C. § 1981)**

112. Ms. Quintana hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

113. Ms. Quintana is a member of a protected class because she is Latinx and Native American.

114. Ms. Quintana's consultancy with Defendants, and in turn her contract with WorkThru, was terminated due to racial discrimination, and Ms. Quintana was treated differently than her white colleagues.

115. As a direct result of Defendant's actions, Ms. Quintana has suffered significant injuries, damages, and losses in an amount to be determined at trial.

116. The effect of the practices complained of above has been to deprive Ms. Quintana of equal employment opportunities, deprive her of her right to make and enforce contracts, and deprive her of the full and equal benefit of laws, because of her race.

117. The unlawful employment practices complained of above were intentional.

118. The unlawful employment practices complained of above were done with malice or reckless indifference to Ms. Quintana's federally protected rights.

### THIRD CLAIM FOR RELIEF
**(Retaliation in Violation of 42 U.S.C. § 1981)**

119. Ms. Quintana hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

120. Ms. Quintana is a member of a protected class because she is Latinx and Native American.

121. Ms. Quintana engaged in protected activity by complaining about racial discrimination.

122. Ms. Quintana's consultancy with Defendants, and in turn her contract with WorkThru, was terminated because she engaged in protected activity by complaining about racial discrimination.

123. As a direct result of Defendant's actions, Ms. Quintana has suffered significant injuries, damages, and losses in an amount to be determined at trial.

124. The effect of the practices complained of above has been to deprive Ms. Quintana of equal employment opportunities, deprive her of her right to make and enforce contracts, and deprive her of the full and equal benefit of laws, because of her race.

125. The unlawful employment practices complained of above were intentional.

126. The unlawful employment practices complained of above were done with malice or reckless indifference to Ms. Quintana's federally protected rights.

**FOURTH CLAIM FOR RELIEF**
**(Discrimination in Violation of 42 U.S.C. § 1985(3))**

127. Ms. Quintana hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

128. Ms. Quintana is a member of a protected class as a transgender woman who is also Latinx and Native American.

129. Defendants, by and through their agents, conspired to deprive Ms. Quintana of equal protection or equal privileges and immunities.

130. Defendants, by and through their agents, conspired to harass and retaliate against Mr. Quintana, as well as terminate Ms. Quintana's consultancy, and in turn interfere with her contract with WorkThru, due to her status as transgender and/or Latinx and Native America woman.

131. Defendants' conspiracy was motivated by sex and/or race discrimination.

132. Defendants' conspiracy was aimed at interfering with rights that by definition are protected against private, as well as official encroachment.

133. As a direct result of Defendants' actions, including the actions of their agents, taken in furtherance of the conspiracy, Ms. Quintana has suffered significant injuries, damages, and losses in an amount to be determined at trial.

134. The effect of the practices complained of above has been to deprive Ms. Quintana of equal employment opportunities, deprive her of her right to make and enforce contracts, and deprive her of the full and equal treatment and benefits of laws, because of her sex and/or race.

135. The unlawful employment practices complained of above were intentional.

136. The unlawful employment practices complained of above were done with malice or reckless indifference to Ms. Quintana's federally protected rights.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests this Court enter judgment for the following relief:

1. Actual economic damages as established at trial;

2. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

3. Punitive damages for all claims as allowed by law for all such claims where applicable;

4. Pre-judgment and post-judgment interest at the highest lawful rate;

5. Appropriate tax-offset

6. Attorneys' fees and costs; and

7. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED: January 27, 2023

RATHOD | MOHAMEDBHAI LLC

*/s/ Iris Halpern*

Iris Halpern (Reg. No. 53112)
Laurie Jaeckel (Reg. No. 41447)

ATTORNEYS FOR PLAINTIFF